**SECOND DIVISION**
**MILLER, P. J.,**
**ANDREWS and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 25, 2018**

# In the Court of Appeals of Georgia

A18A0388. IN THE INTEREST OF A. B. et al., children.

MILLER, Presiding Judge.

Anita Wright appeals from the juvenile court's order terminating her parental rights to her eight children, arguing that the juvenile court erred by (1) permitting the most recent case manager, rather than the previous one, to testify at the termination hearing, (2) finding that there was current dependency, (3) finding that the dependency was likely to continue, (4) finding that the continued dependency was likely to cause harm to the children, and (5) denying her motion for a new trial.[1] After a thorough review of the record, we conclude that the juvenile court properly

---

[1] The oldest child has a different biological father than the other seven children, however, the biological father of the oldest child was never located. The biological father of the remaining children also had his rights terminated. This appeal involves only the termination of the mother's parental rights, as the father has not appealed.

terminated the mother's parental rights with respect to three of the children, but not as to the other five, because there was no evidence addressing the likelihood of continued harm stemming from the dependency for the remaining five children. Accordingly, we affirm the termination order as to the two oldest children and the youngest, but must reverse as to the other five children.

On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the juvenile court's ruling and determine whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should be terminated. *In the Interest of C. S.*, 319 Ga. App. 138, 139 (735 SE2d 140) (2015). Nonetheless,

> this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

(Footnote omitted.) *In the Interest of E. G. L. B.*, 342 Ga. App. 839, 840 (805 SE2d 285) (2017).

So viewed, the evidence shows that on August 14, 2014, the Georgia Department of Family and Children's Services ("DFCS") took Wright's eight children, ranging in age from five days old to twelve years old, into custody after learning that the family was living in an abandoned apartment with no running water or electricity. The children lacked medical and dental care and were not attending school. Additionally, the family had limited food and water, there was trash piled up around the apartment, and there had been instances of violence in the home. Based on those living conditions, DFCS filed a dependency petition and an amended dependency petition, alleging that the children lacked parental care or control, the father was using marijuana, and there had been acts of family violence and verbal abuse in the home, especially against the two oldest children.

The juvenile court found the children dependent and in need of the court's protection as a result of the allegations of abuse and neglect. This finding was never appealed. The juvenile court noted the emotional and physical abuse alleged by the two oldest children and that the newborn child had to be hospitalized immediately for hypothermia upon being taken into custody. Thereafter, DFCS set up a case plan with the goal of reunification for the parents. The juvenile court adopted the case plan, concurrent with reunification and guardianship, which required the mother to do the

following: (1) complete a parental fitness/psychological evaluation; (2) obtain and maintain stable housing; (3) obtain and maintain a source of income; (4) sign a release of information; (5) attend all hearings; (6) notify DFCS of any changes of address, phone numbers or jobs within 48 hours; and (7) contact DFCS to schedule appointments to discuss her progress. The two oldest children required trauma assessments, and the remaining children were to be assessed for various therapies. The children were placed in several different foster homes and given sibling visitation. The parents were given visitation with all of the children.

In September 2014, all of the children underwent assessments at Bagley Youth Development. The oldest child's trauma assessment showed that she suffered from PTSD as a result of abuse and neglect. The oldest child revealed that she suffered beatings with a stick, a belt, and a metal pole. She further witnessed the abuse of her siblings and other domestic violence.

The trauma assessment of the second oldest child reported that she also had been the victim of physical abuse and had witnessed the abuse of her siblings along with domestic violence in the home. She was frightened of her parents, but also missed them. She suffered from depression, anxiety, and symptoms of PTSD.

4

Between October 2014 and April 2015, the mother made some progress on her goals, but had yet to obtain the necessary income and housing.[2] At a hearing on April 30, 2015, the oldest child's therapist testified that the child disclosed that her parents were physically and mentally abusive, she had been "parentified,"[3] she had nightmares about returning home, and she no longer wished to visit her parents. The therapist testified that the child was diagnosed with PTSD and continued contact with her mother was detrimental to her. Additionally, the therapist testified that the other children had been exposed to the parents' violent behavior. Further, the children's case manager testified that she had observed at least five visits with the parents and that the two oldest children and one of the middle children cried and said they were afraid to go home.

Following this hearing, in 2015, the juvenile court suspended visitation between the two oldest children and the parents. Later that year, DFCS changed the case plan from reunification to adoption. During a permanency hearing in December 2015, the juvenile court noted that the parents had not completed family therapy or

---

[2] The records reflect some discrepancies with regard to the completion of the mother's goals.

[3] The term "parentified" refers to the child being placed in a caregiver role for other family members.

the necessary bonding assessments, and that the mother had ceased her individual therapy.

In March of 2016, DFCS filed for termination of the parents' rights, alleging that the children were dependent, that the dependency would continue and cause harm, and that the parents had not completed their reunification case plan.

A court appointed special advocate ("CASA") submitted a report in June 2016, finding that the two oldest children did not wish to see their parents and hoped to be adopted. The third oldest child wanted to return to her parents, and the remaining children were too young to express a preference. The CASA recommended that the children remain in their current foster placement with the long-term goal of adoption.

In July 2016, the parents were indicted for cruelty to children, aggravated assault, family violence battery, and terroristic threats. As a condition of bond, the parents were barred from having any of the minor children live with them.

At the subsequent termination hearing, the oldest child testified that she did not want to return to her biological parents and that she wanted to be adopted by her foster parent. She stated that her parents had beaten her from the time she was five years old, that she was consistently responsible for parenting her younger siblings, and that she would be beaten if the younger children did anything wrong. Her parents

usually struck her with a belt, but on one occasion they used a stick. Additionally, her mother called her names and threatened her with a knife. She was not allowed to leave the house or go to school, but was not home schooled either. She did not believe her parents could change, despite progress on their case plans, because she had seen prior instances in which they resorted to their old behavior once supervision ceased.

The second oldest child's therapist testified that the child experienced PTSD and persistent depressive disorder with anxious distress as a result of the physical and verbal abuse she and her siblings suffered. She noted that the child had been parentified, either by her parents or by her older sister, and that if she made a mistake while in charge of the younger children, she would be abused. She testified that the child wanted to be adopted, in part because she was afraid that if she were returned to her parents, she would be punished for speaking out about the abuse. The therapist noted that the child's condition had improved with therapy, and she recommended that the child be adopted given the severity of her PTSD and the trauma she suffered.

The eight-year-old daughter testified that she wanted to visit her parents, but would want to live with them if they had a better home than they did before. The

seven-year-old girl and six-year-old boy both testified that they wanted to return to their parents. The remaining children did not testify.

DFCS case manager Aliandrise Johnson testified, over the mother's objection, that she was the current case manager for the children, and that she based much of her testimony on the other reports and documents from previous case managers. She reported that the mother had not completed individual counseling, the parents had not paid any child support, and she could not verify the mother's income.[4] She explained that she had visited the parents' home, but there were no beds, clothes, or toys for the children. She noted that criminal charges were pending and that as a condition of bond, the parents could not have the minor children in the home.

She further testified that all of the children had adoption resources, and she believed that continued placement in the foster system was harmful because the children needed a sense of permanency. She acknowledged, however, that only the two oldest children expressed the desire to be adopted. Additionally, she stated that the youngest child had been in foster placement since immediately after birth,

_____

[4] Although the case manager testified at the termination hearing that she could not verify the mother's housing or employment status, the record contains some evidence that the mother obtained housing and employment, and the case manager also testified that she had visited the mother's home.

8

interacted with his foster family very well, and would cry when the foster parents left the room. The youngest child's foster mother confirmed the child's bond with their family.

The CASA also testified at the termination hearing, stating that he had been working with the children for 14 months and had observed several parent-children visitations. He recommended adoption for all of the children, noting that the youngest had bonded to his foster family, and that the two oldest children did not want to return home.

Finally, Keisha Smikle testified that she was the aide and transporter assigned to take the children to visitation with siblings and parents. She noted that the parents had missed several of the planned visits and that, although the children interacted with each other during these visits, they only interacted with their parents sometimes. She stated that the youngest child did not run to the parents or seem excited to see them.

The juvenile court granted DFCS's petition to terminate the parental rights as to all eight children. The juvenile court found that the children were dependent given the parents' failure to provide for their care and to develop any parental bond with the children, along with the physical and emotional abuse. The juvenile court further

found that the dependency was likely to continue in light of the oldest child's testimony that the parents had relapsed in the past. The juvenile court then found that the continued dependency was likely to cause harm, given the evidence of PTSD, parentification of the two oldest children, and the youngest child's failure to bond with his biological parents given his placement in foster care since birth. The court stated that the harm would continue for all eight children due to the need for consistency and permanency. Finally, the juvenile court found that termination of parental rights and adoption were in the best interest of all the children, again pointing to the two oldest children's desire to be adopted. Accordingly, the court terminated the parents' rights.

Thereafter, the mother entered a plea to the criminal charges, which also removed the restriction on the children living with her. The mother filed a motion for reconsideration and for a new trial, both of which the juvenile court denied.[5] This Court then granted the application for discretionary appeal, and this appeal followed.

OCGA § 15-11-310 sets forth the grounds for terminating parental rights and provides, in relevant part, that

---

[5] Due to a clerical mistake, the mother was not informed of the decision. Accordingly, the juvenile court granted a motion to vacate its order and then re-entered the order to permit the mother to file her application for discretionary appeal.

10

(a) In considering the termination of parental rights, the court shall first determine whether one of the following statutory grounds for termination of parental rights has been met: . . .

. . .

(5) A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

"Dependent child" is defined as a child who . . . "[h]as been abused or neglected and is in need of the protection of the cour[t]." OCGA § 15-11-2 (22) (A), "'Neglect' means . . . [t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or moral[s]." OCGA § 15-11-2 (48) (A).

If any of the statutory grounds for termination are met, the court shall then consider whether termination is in a child's best interests after considering certain factors. OCGA § 15-11-26. "[T]he standard of proof to be adduced to terminate parental rights shall be by clear and convincing evidence." OCGA § 15-11-303. With these requirements in mind, we turn to the mother's arguments on appeal.

11

1. The mother argues that there was no evidence to support a termination of rights. In reviewing the juvenile court's order, we look to whether the record was sufficient to support the termination as to each of the eight children. We conclude that the record was insufficient as to five of the children.

(a) Before considering the substantive challenges to the juvenile court's findings, we address the mother's evidentiary claim of error in allowing the current case manager to testify based on hearsay contained in the reports of prior case managers. We discern no reversible error.

Pretermitting whether it was error to allow the case manager to testify based on the records, the case manager's testimony was duplicative of other evidence in the record and presented at the termination hearing, including the testimony of the children, therapist, CASA, and transporter. We thus conclude that the error, if any, did not affect the juvenile court's determination. See *In the Interest of S. A. B.*, 269 Ga. App. 705, 708 (605 SE2d 100) (2004).

(b) Turning to the first prong of the statutory grounds for termination, the mother argues that the juvenile court erred because it focused only on the prior instances of alleged abuse and neglect and it should not have considered the economic circumstances of the foster families. We disagree.

12

The mother did not appeal the juvenile court's order finding that the children were dependent, and thus she is bound by that order. *In the Interest of B. M.*, 298 Ga. App. 100, 102 (1) (a) (679 SE2d 113) (2009). Nevertheless, we find that the juvenile court's order finding dependency based on numerous allegations of abuse and neglect is supported by clear and convincing evidence.[6] See OCGA § 15-11-2 (22); see also OCGA § 15-11-311 (a) (5) (court can consider prior instances of physical and emotional abuse to determine that child is without proper parental care and control). Here, the oldest two children repeatedly alleged that their mother beat them, called them names, and threatened them. One of the therapists testified that the children suffered from PTSD as a result of the physical abuse and witnessing instances of abuse of their siblings, as well as domestic violence. *In the Interest of R. B.*, 322 Ga. App. 421, 424-425 (745 SE2d 677) (2013); *In the Interest of A. R.*, 287 Ga. App. 334, 336 (651 SE2d 467) (2007) ("A juvenile court may consider a mother's inability to properly care for one child as evidence that she will not be able to care for her other children."). We thus conclude that the juvenile court's finding of dependency was

---

[6] Although the mother asserts in her brief that the juvenile court found that the children had been abandoned, the juvenile court did not make such a finding with respect to the mother.

13

supported by clear and convincing evidence. OCGA § 15-11-311 (a) (4), (5).

(c) As to the second prong of the analysis, the mother contends that there was no clear and convincing evidence that the dependency was likely to continue, at least as it pertains to the six younger children, because the evidence showed that she had complied with most of her case plan and none of the younger children were given trauma assessments. We discern no error.

As the mother acknowledges, the juvenile court may consider past conduct in considering whether the dependency is likely to continue. See *In the interest of J. S.*, 292 Ga. App. 86, 89 (663 SE2d 793) (2008); see also OCGA § 15-11-311 (a) (4), (5) (court may consider instances of physical or emotional abuse of another child in considering whether child is without parental care or control). Here, the juvenile court noted that the oldest child testified that her parents had case plans in the past and failed to comply. See *In the Interest of S. N.*, 291 Ga. App. 628, 632 (1) (a) (662 SE2d 381) (2008) (juvenile court may find "that the parents' conduct over the years was a

14

better predictor of their future conduct than a few months of partial stability")

(citation and footnote omitted).[7]

Moreover, the mother failed to complete many of her case plan goals, including providing child support to the children, completing individual therapy, and completing family therapy. See *In the Interest of M. E. M.*, 272 Ga. App. 451, 455 (612 SE2d 612) (2005) (likelihood of harm proved by evidence showing that mother had no stable income or housing, had no parental bond with the children, and had made no effort to provide any kind of support for children while they were in DFCS custody). Without such therapy, we agree with the juvenile court that there is clear and convincing evidence that the abuse that led to the dependency is likely to continue. See *In the Interest of J. B. M.*, 284 Ga. App. 480, 485 (1) (644 SE2d 317) (2007) (juvenile court can consider parent's past refusal to remedy abuse as evidence that dependency is likely to continue) (citation and punctuation omitted).

(d) Finally, as to the third prong, the mother contends that the juvenile court erred by finding that the continued dependency was likely to cause harm to the

---

[7] Because the statutory provisions under the old juvenile code contain similar factors and statutory requirements, we look to cases decided under the old code for guidance. See, e.g. *In the interest of E. G. L. B.*, 342 Ga. App. 839 (805 SE2d 285) (2017) (relying on cases decided under the old juvenile code in case brought under new juvenile code).

children because there was no testimony as to the potential harm to the six youngest children. We agree as to five of the six youngest children.

In determining whether harm to the child exists,

our law requires a juvenile court to consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent. Thus, the court must assess whether a child currently in foster care is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care, and also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the [dependency] persists.

(Citations and punctuation omitted.) *In the Interest of A. S.*, 339 Ga. App. 875, 881 (3) (794 SE2d 672) (2016). Moreover,

an order terminating parental rights must contain explicit findings supporting the conclusion that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. Indeed, the propriety of a termination order is inextricably intertwined with one of this republic's oldest and most sacred fundamental liberties—the right to maintain familial relations and integrity. To this end, a mere recitation that this legal requirement was met will not suffice. Instead, the juvenile court must ascertain the facts and state not only the end result of that inquiry but the process by which it was reached.

16

(Citations and punctuation omitted.) Id.

The record contains ample evidence supporting termination of rights for the two oldest children and the youngest. The two oldest children testified to the abuse and their desire not to return to their mother, and one child's therapist testified to the effects and likely harm that the abuse had caused and could continue to cause if the child was returned to her parents. Additionally, both the DFCS case worker the CASA testified that returning these children would be detrimental and that they recommended adoption. This testimony provides clear and convincing evidence to support the juvenile court's termination order with respect to the two oldest children. See *In the Interest of J. B. M.*, supra, 234 Ga. App. at 485 (1).

Additionally, with respect to the youngest child, there was clear and convincing evidence to support termination. The youngest child has been in foster care since birth, he has no bond with his biological parents, he has bonded with his foster family, and the foster family was willing to adopt him. *In the Interest of C. A. W.*, 272 Ga. App. 4, 6 (611 SE2d 154) (2005) ("We have previously held that where evidence showed no parental bond between parent and child, the child had adapted well to foster care, and the foster parent wished to adopt, this was sufficient to support the juvenile court's conclusion that continued [dependency] was likely to harm the

17

child."). We therefore affirm the juvenile court's order terminating the mother's parental rights to these three children.

As to the remaining five children, the record is devoid of any evidence showing that the dependency is likely to continue or that continued dependency would cause harm to the children, as required to support the termination order. Here, the bulk of the evidence at the hearing and in the record itself outlines the harm to the two oldest children and the youngest if they returned to their mother or stayed in foster care. However, the record is devoid of any evidence as to how the home environment harmed the other five children. There are no trauma assessments for those five children, no therapy notes or testimony, and these five children expressed the desire to return to their parents. "It is not automatically true that a finding that [dependency] is likely to continue will support a finding that continued [dependency] will harm the child." (Citation and punctuation omitted.) *In the Interest of J. B. M.*, supra, 284 Ga. App. at 487 (2) (d). Given the complete lack of evidence regarding the other five children, and in recognition of the magnitude of a termination decision, we cannot conclude that the decision to terminate the mother's rights with respect to the middle five children is supported by clear and convincing evidence. *In the Interest of A. S.*, supra, 339 Ga. App. at 881 (3).

We acknowledge that, in some cases, the trauma and abuse perpetrated against one child can be imputed to the other children for purposes of termination proceedings. See *In the Interest of S. B.*, 312 Ga. App. 180, 183-184 (1) (718 SE2d 49) (2011) (sexual abuse of older siblings allowed court to infer adverse effect on younger siblings and find children deprived); *In the Interest of I. G.*, 236 Ga. App. 642, 643-644 (513 SE2d 53) (1999) (mother's abuse of one child that left the child in a persistent vegetative state and for which the mother pled guilty to aggravated battery and cruelty to children and was incarcerated, warranted finding that other children were deprived). Such evidence may allow a court to infer that the other children in the home are dependent, but it does not automatically establish that the dependency will continue and is likely to cause harm. *In the Interest of J. B. M.*, supra, 284 Ga. App. at 487 (2) (d). In light of the current lack of evidence that the physical abuse of the older children harmed the younger children, we are constrained to conclude that the juvenile court's order terminating the mother's parental rights for those five children was in error.

Accordingly, we affirm the termination of the mother's rights with respect to the two oldest children and the youngest child, but reverse the juvenile court's order

with respect to the other five children.[8] In doing so, we are mindful that the children have been in foster care, with families ready to adopt them, for well over three years. It is conceivable that termination of parental rights as to the five remaining children is appropriate. Nevertheless, given the "drastic measure of permanently and irrevocably severing the natural parent-child relationship," we cannot conclude that the record before us provides the clear and convincing evidence to support the conclusion that termination is warranted as to these five children. See *In the Interest of E. G. L. B.*, supra, 342 Ga. App. at 848 (1).

2. Finally, the mother argues that the trial court erred in denying her motion for new trial because the verdict was against the weight of evidence. We disagree.

The juvenile court has the discretion to grant or deny a motion for new trial in termination proceedings. *In the Interest of S. B.*, 335 Ga. App. 1, 9 (1) (780 SE2d 520) (2015).

In her motion for new trial, the mother argued that the juvenile court erred in allowing the oldest child to testify, excluding evidence of a bonding assessment, and failing to consider the subsequent finalization of her criminal charges. Although the

---

[8] The mother does not argue that the juvenile court erred by finding that termination was not in the children's best interest, and thus she has abandoned this issue. *In the Interest of R. S.*, 287 Ga. App. 228, 232 (2) (651 SE2d 156) (2007).

20

juvenile court has the authority to consider new evidence in a motion for new trial, *In the Interest of S. B.*, supra, 335 Ga. App. at 9 (1), the court's failure to do so in this case is not an abuse of discretion. Here, the evidence the mother sought to introduce was an alleged bonding assessment that was never entered into evidence, and for which neither party subpoenaed the therapist to testify. Moreover, the criminal charges, although one factor to be considered in the termination case, was not the juvenile court's sole basis for terminating the mother's rights. The fact that the mother had resolved the pending criminal charges, which thus enabled her to have the minor children in her home, did not minimize the continued dependency resulting from years of neglect, abuse, and domestic violence. Thus, on these facts, we cannot conclude that the juvenile court abused its discretion in denying the motion for new trial.

In summary, we find clear and convincing evidence to support termination of the mother's parental rights regarding the two oldest children and the youngest child, and the juvenile court's order is affirmed in this regard. We do not find that there is clear and convincing evidence regarding the other five children on the present record, and we therefore reverse the juvenile court's order with respect to these children.

*Judgment affirmed in part, reversed in part. Andrews and Brown, JJ., concur.*