353 Ga. App. 855

A19A2328. IN THE INTEREST OF L. K. et al., children.

DILLARD, Presiding Judge.

David Keller appeals from the juvenile court's order finding that his minor children—La. K. and Lo. K.—are dependent. Specifically, Keller argues the court erred in concluding there was clear and convincing evidence to support a finding that he failed to protect and properly supervise the children. Because we agree that the juvenile court was not presented with clear and convincing evidence of dependency, we reverse.

Viewed in the light most favorable to the juvenile court's judgment,[1] the record shows that in January 2019, petitions for dependency were filed with reference to La. K. and Lo. K., alleging that the children's mother suffered from "an unrehabilitated addiction to illegal drugs which significantly impairs her ability to provide adequate care, control, and supervision for the children."[2] The petitions further alleged that the children's father "suffers from an addiction to illegal drugs," and was then on probation following a conviction for possession of methamphetamine.

---

[1] *See, e.g.*, *In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018) ("On appeal from an order finding a child to be a dependent child, we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent." (punctuation omitted)).

[2] The mother is not a party to this appeal.

The juvenile court subsequently issued a protective order as to the children's mother, ordering that she have no unsupervised contact with the children and undergo drug and alcohol treatment. Then, on March 5, 2019, the Department of Family and Children Services ("DFCS") amended its petition for dependency as to the children's father, alleging that Keller "failed to protect the children by leaving [them] in the care of the mother despite being aware of the mother's active addiction to illegal drugs" and "failed to provide adequate supervision for the children by leaving the children in the care of the mother while he works."

On March 29, 2019, following the hearing on the petition, the juvenile court issued a protective order as to Keller, ordering that he "[e]nsure the mother has no unsupervised contact with the children." Then, on April 28, 2019, nunc pro tunc to the hearing conducted on March 29, 2019, the court issued its "Order of Adjudication as to the Father and Disposition as to the Mother." In doing so, the court summarized the testimony it received at the hearing and ultimately concluded that the children were dependent as a result of their mother's ongoing substance abuse (although their father was not doing so). The court further found that the children were dependent because they were abused or neglected, and that the father "actually knew or should have known the mother was using drugs prior to January of 2019." The court also

2

determined that, despite this knowledge, the father "continued to leave the children in the mother's care, while he went to work," and that he was "unwilling or unable to involve other adults to supervise the children while he is working." As a result, the court concluded that the "causes of dependency as to the father are a failure to protect the children and a failure to provide adequate supervision."

Ultimately, as to Keller, the juvenile court ordered that the children could remain in the home with him under the protective order issued following the hearing, noting that it expected "a request for a dependency removal order if any of the terms of the protective order are violated by the parents." The court further ordered that the mother's protective order remain in effect and she was not to live in the home or have unsupervised visitation with the children. Additionally, the court ruled that, as to Keller, it would "consider what steps the father takes between now and the next hearing to provide adequate supervision for the children in making [a] final disposition determination." Finally, the court also ordered that a disposition hearing for Keller be conducted on April 19, 2019.[3]

---

[3] The appellate record does not contain a transcript from any hearing on April 19, 2019, but it does include an "acknowledgment of future hearings notice" dated April 19, 2019, and signed by the DFCS case manager, attorney for DFCS, guardian ad litem, mother's attorney, mother, Keller's attorney, and Keller. This notice reflects that a disposition hearing would be held on May 10, 2019. The appellate record also

On May 23, 2019, the juvenile court issued an "Emergency Modification of Disposition Order" as to Keller after he appeared at a DFCS office without an appointment on May 17, 2019, and "exhibited extremely bizarre and aggressive behavior and had to be asked to calm down." According to the order, Keller was ultimately referred for an assessment and was, at that time, hospitalized in order to receive mental health treatment. As a result, he was unable to supervise or care for the children, and the mother requested that they be placed in foster care and informed DFCS of several violent physical altercations that had recently taken place with Keller. Based upon these and other facts, the court concluded that "continuation of the children in the home of the father . . . is contrary to their welfare," and that removal would be in their best interests. But prior to issuance of the May 23, 2019 order, on April 30, 2019, Keller filed a notice of appeal to the order finding the children dependent. It is this initial dependency order that Keller challenges on appeal.

When analyzing an appeal from an order finding a child to be dependent, we review the juvenile court's finding of dependency "in the light most favorable to the

does not contain a transcript from any hearing on May 10, 2019. Nevertheless, the relevant order on appeal was issued by the trial court on April 28, 2019, *nunc pro tunc* to March 29, 2019.

4

lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent."[4] And in making this determination, we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that it must "consider and protect the welfare of a child whose well-being is threatened."[5] With these guiding principles in mind, we turn to Keller's sole enumeration of error.

---

[4] *In the Interest of T. Y.*, 350 Ga. App. 553, 558 (829 SE2d 808) (2019) (punctuation omitted); *accord In the Interest of R. D.*, 346 Ga. App. at 259 (1); *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016). The Juvenile Code was "substantially revised in 2013." *In the Interest of M. F.*, 298 Ga. 138, 140 (1) n.4 (780 SE2d 291) (2015). Importantly, the former Juvenile Code "authorized a juvenile court to award custody to the Department of any minor child shown to be 'deprived.'" *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4. But the current Juvenile Code "uses the word 'dependent' in lieu of 'deprived.'" *Id.* In this case, DFCS filed its initial complaint in 2019, such that the new Juvenile Code applies. *See* OCGA § 15-11-16 (a) (3) (providing that a proceeding under the new Juvenile Code "may be commenced . . . [b]y the filing of a complaint or a petition as provided in Article[ ] 3 . . . of [the new Juvenile Code]," which governs dependency proceedings); *In the Interest of M. F.*, 298 Ga. at 140 (1) n.4 (noting that the new Juvenile Code applies to proceedings commenced on or after January 1, 2014). Nonetheless, given the similarities between the definition of a "deprived child" and that of a "dependent child," we find that "our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child." *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4.

[5] *In the Interest of T. Y.*, 350 Ga. App. at 558 (punctuation omitted); *accord In the Interest of S. C. S.*, 336 Ga. App. at 245.

5

As detailed supra, in its order of adjudication as to Keller, the juvenile court found that the children were dependent because they were abused or neglected by their mother, and that Keller "actually knew or should have known the mother was using drugs prior to January of 2019." And despite this knowledge, Keller continued to "leave the children in the mother's care, while he went to work," and was "unwilling or unable to involve other adults to supervise the children while he is working." Accordingly, the court found the "causes of dependency as to the father are a failure to protect the children and a failure to provide adequate supervision." On appeal, Keller argues that the trial court was not presented with clear and convincing evidence that he knew or should have known about the mother's continued drug use or that he failed to act properly with regard to his children's welfare.

At the hearing on the dependency petition, the trial court heard testimony from a law-enforcement officer who responded to the parents' home two or three times. One such call was made in December 2018, due to a concern that the mother might be suicidal. When the officer arrived, the mother appeared to be under the influence of opioids.

Keller was at the house on this occasion and was "highly upset" over the mother's condition and his concern for the children. The mother told the officer that

6

she was returning home with the children after being at a family member's house. And during this visit, the officer observed Keller changing one of the children's diaper, which appeared to have "multiple bowel movements inside." Keller then expressed concern over the mother's well-being and her ability to care for the children, and he told the officer that the mother abused opioids and heroin.

Using Keller's phone, the officer contacted DFCS. But the officer testified that, in his opinion, the children were being adequately cared for by their father on that particular day. The officer observed that the condition of the family's home was "average" to "slightly above average," and he considered that, "[f]or having two toddlers[,] it was adequately cleaned." The officer spoke with Keller about finding a support network to provide childcare or daycare while he worked. Thus, at the end of his visit, the officer's concerns were about the children's mother, not Keller, and he felt comfortable leaving the children in Keller's care after the mother was transported to a hospital for evaluation.

Keller testified at the hearing and admitted that he last used methamphetamine approximately one year prior and that he stopped using after being incarcerated. Since his release, Keller had been working a 9 to 5 schedule doing mechanic work. But in the last week or so, he stopped working so that he could concentrate on being home

7

more with the children and focus on doing his "own type of employment at the house." Keller also testified that, when he was working, the children stayed at home with their mother.

According to Keller, his wife entered a drug detox program in January 2019, and he did not believe that she had been using drugs since that time because he had not observed her using drugs or any behaviors associated with drug use. And prior to her entry into the detox program, Keller called law enforcement two times regarding the mother's drug use—once in October 2018, and again in December 2018. He called police in October after seeing his wife preparing to smoke crack, which he had never seen her do before. As a result of that call, officers found *Keller* holding the crack pipe, and he was told to leave the home for a few days while his wife and a friend watched the children.

Then, Keller called law enforcement in December 2018, to report that his wife was making suicidal statements. But his primary concern at that time was that his wife arrived home with the children after driving while under the influence of drugs. According to Keller, he had not seen her use drugs or be under the influence between the call to law enforcement in October and this occasion. Thus, Keller testified that he was surprised when his wife arrived home with the children in the car while

8

intoxicated because she had been sober when she left with them only a few hours before. He repeatedly testified that his wife had been "doing good" and "had been sober."

When asked if, looking back, he questioned his decision to leave the children with their mother, Keller responded that, "[a]t the time[,] it really wasn't up for option because [he] had to have a job." Indeed, it was undisputed that Keller had been enrolled in a program that required 90 days of employment, but he had recently completed this program and was no longer required to work a 9 to 5 job. Instead, he could now work from home, selling vehicle parts and doing mechanic work while watching his children.

Keller admitted that he lied to the DFCS case manager about the children being enrolled in daycare, but he explained that the $1,000-a-month cost had been unaffordable, and it was his intention to watch the children while his wife went back to work. He agreed that, if his wife recently failed a drug test, she needed to enter additional drug-rehabilitation treatment and perhaps be subject to random screening to "keep her honest." But he testified that since January 2019, he believed that his wife had been sober. And upon learning that his wife failed her most recent drug

9

screen, Keller speculated that she used drugs at night while he was asleep, because he had been unaware that she was still using.

Keller further testified that his wife was "a very good mother," their home was "pretty much always spotless," and the children rarely needed anything. Thus, he had "no issues leaving them with her while [he] was at work." He expressed hesitation over leaving his children with anyone else, but said that he trusted his wife and that, "[o]ther than the drug use[,] it's good." He denied that his wife had been left alone with the children since he had been working from home.

Next, the children's mother testified that she never used drugs with Keller, she last used oxycodone several years ago, and she had not used heroin since January 2019. But according to her, she only used heroin twice a year and was not "really a heroin addict," though she previously used oxycodone more frequently. The mother admitted that she had a problem with addiction and needed additional treatment, but she denied using crack. She also denied being under the influence when Keller called law enforcement in December 2018, though she admitted to using in January 2019, just prior to entering the detox program. She further denied any recent drug use and could not explain why a recently conducted screening was positive for heroin metabolites, again saying that she had not used drugs since January 2019.

10

The children's mother also testified that, since the court issued its protective order, Keller had been present with her and the children and would even take a monitor with him when working outside. She also agreed that the children were no longer in daycare because the cost was unaffordable. She further testified that on the occasions she used heroin, Keller did not know about it.

Finally, the family's DFCS case manager testified that, prior to the incident involving law enforcement in December 2018, both parents submitted negative drug screens. Indeed, when the case manager arrived after law enforcement on the day in question, the mother had already been taken to the hospital, but he met with Keller and the children. Keller told the case manager that he wanted his wife to get clean again and that he had photographic evidence of her drug use. Keller called DFCS to the house in January, just prior to the mother entering the detox program, because he believed that she was under the influence of drugs.

At the conclusion of the hearing, the juvenile court found that the children were dependent as to Keller because it believed he knew or should have known that the mother was continuing to use drugs after returning from the treatment program in January. Nevertheless, the court elected to keep the children in the home with Keller until a final dispositional hearing could be held, stating on the record that in the time

11

between January 2019 and the date of the hearing, "the children have not suffered actual harm in those couple of months." In the order issued by the trial court, the children were found dependent as defined by OCGA § 15-11-2 (22).

Notably, even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency resulted from unfitness on the part of the parent that is, "either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[6] Thus, only under compelling circumstances that are found to exist by such clear and convincing proof may a court sever, even temporarily, the parent-child custodial relationship.[7] This is because "the right to the custody and control of one's child is a fiercely guarded right in our society and in our law."[8] Indeed, as our Supreme Court recently emphasized, the right of familial

[6] *In the Interest of A. J. H.*, 325 Ga. App. 848, 852 (755 SE2d 241) (2014) (punctuation omitted); *accord In the Interest of C. R.*, 292 Ga. App. 346, 351 (2) (665 SE2d 39) (2008).

[7] *In the Interest of A. J. H.*, 325 Ga. App. at 852; *accord In the Interest of H. S.*, 285 Ga. App. 839, 841 (648 SE2d 143) (2007); *In the Interest of A. J. I.*, 277 Ga. App. 226, 227 (626 SE2d 195) (2006); *In the Interest of S. J.*, 270 Ga. App. 598, 599 (607 SE2d 225) (2004).

[8] *In the Interest of H. S.*, 285 Ga. App. at 843-44 (punctuation omitted); *accord In the Interest of A. J. I.*, 277 Ga. App. at 230.

12

relations is "among the inherent rights that are derived from the law of nature."[9] And

because of the sacred right at stake in custody proceedings, generally, the record must

contain evidence of present dependency, not merely past or potential future

dependency.[10] Finally, the party bringing the petition alleging dependency carries the

burden of proof, not the parent from whose custody the child will be removed.[11]

Under OCGA § 15-11-2 (22) a "dependent child" is one who "[h]as been

abused or neglected and is in need of the protection of the court[;] . . . [h]as been

placed for care or adoption in violation of law; or . . . [i]s without his or her parent,

guardian, or legal custodian."[12] Here, the juvenile court found that La. K. and Lo. K.

had been abused and neglected. "Neglect" is defined as, inter alia, "[t]he failure to

---

[9] *Patten v. Ardis*, 304 Ga. 140, 141 (2) (816 SE2d 633) (2018); *accord Sloan v. Jones*, 130 Ga. 836, 847 (62 SE 21) (1908), *superseded by statute on other grounds as recognized by Proctor v. Proctor*, 164 Ga. 721 (139 SE 531) (1927); *Moore v. Dozier*, 128 Ga. 90, 93-94 (57 SE 110) (1907); *see generally In the Interest of R. B.*, 346 Ga. App. 564, 571-76 (816 SE2d 706) (2018) (Dillard, C. J., concurring fully and specially).

[10] *In the Interest of A. J. H.*, 325 Ga. App. at 852; *accord In the Interest of R. S. T.*, 323 Ga. App. 860, 863 (748 SE2d 498) (2013).

[11] *In the Interest of T. Y.*, 350 Ga. App. at 559; *see* OCGA § 15-11-180 ("The petitioner shall have the burden of proving the allegations of a dependency petition by clear and convincing evidence.").

[12] OCGA § 15-11-2 (22) (A)-(C).

13

provide a child with adequate supervision necessary for such child's well-being[.]"[13] "Abuse" is defined as "[a]ny nonaccidental physical injury . . . ; . . . [e]motional abuse; . . . [s]exual abuse or sexual exploitation; . . . [p]renatal abuse; or . . . [t]he commission of an act of family violence . . . in the presence of a child."[14] Moreover, a finding of parental unfitness is "essential to support an adjudication of present dependency."[15] And in this respect, "unfitness" refers to "intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[16]

Here, the trial court indicated that there was no evidence the children had been harmed by the father's actions between January 2019 and the time of the hearing on March 29, 2019. Indeed, the undisputed testimony was that since Keller's required-employment program had been successfully completed, he was working from home and had not left the children alone with their mother. And even prior to this time,

---

[13] OCGA § 15-11-2 (48) (B).

[14] OCGA § 15-11-2 (2) (A)-(E).

[15] *In the Interest of H. B.*, 346 Ga. App. 163, 165 (1) (816 SE2d 313) (2018); accord *In the Interest of E. N. R.*, 323 Ga. App. 815, 816 (748 SE2d 293) (2013).

[16] *In the Interest of H. B.*, 346 Ga. App. at 165 (1) (punctuation omitted); accord *In the Interest of G. R. B.*, 330 Ga. App. 693, 700-01 (769 SE2d 119) (2015).

14

there was no evidence of any harm suffered by the children while in the mother's care since her return from a detox program in January, even if she continued to use drugs—which we, of course, in no way condone.[17]

Considering the foregoing, including the fact that the juvenile court elected to keep the children in Keller's custody at least temporarily, the court lacked clear and convincing evidence that the children were *presently* deprived as to Keller. As we have previously explained, when a juvenile court is faced with a petition to find a child dependent, such a petition is "brought on behalf of the child and it is the *child's* welfare and *not* who is responsible for the conditions which amount to [dependency] that is the issue."[18] Indeed, the definition of "dependent" focuses upon the *child's*

---

[17] *See In the Interest of M. L. C.*, 249 Ga. App. 435, 439 (2) (548 SE2d 137) (2001) (reversing finding of deprivation when, despite "the mother's abuse of prescription drugs or the father's use of marijuana, the evidence does not clearly and convincingly establish that [the child] is deprived" when "it is uncontroverted that the parents, despite their problems, have taken care of [the child]"). Because the mother is not a party to this appeal, and the trial court's findings as to her necessarily are not challenged, we do not address the appropriateness or inappropriateness of the trial court's finding of dependency or adjudication as to the mother except to the extent that any of these findings reflect upon Keller.

[18] *In the Interest of G. R. B.*, 330 Ga. App. at 700 (punctuation omitted) (emphasis supplied); *accord In the Interest of A. J. H.*, 325 Ga. App. at 851; *In the Interest of D. Q.*, 307 Ga. App. 121, 124 (704 SE2d 444) (2010).

needs and situation.[19] Thus, the record before the deciding court must contain evidence of *present* dependency, *not* merely past or potential future dependency.[20]

And here, even viewing the juvenile court's order in the light most favorable to its judgment, DCFS failed to demonstrate *present* harm to the children by Keller, and thus clear and convincing evidence of dependency was not established when the court conducted the hearing, notwithstanding whatever may have occurred *after* the order issued.[21] Accordingly, for all these reasons noted, we reverse the juvenile

---

[19] *See* OCGA § 15-11-2 (22) (defining a "dependent child" as one who "[h]as been abused or neglected and is in need of the protection of the court[;] . . . [h]as been placed for care or adoption in violation of law; or . . . [i]s without his or her parent, guardian, or legal custodian"); *see also In the Interest of G. R. B.*, 330 Ga. App. at 700 ("Indeed, the definition of 'deprived' focuses 'upon the needs of the child regardless of parental fault.'") (relying upon former OCGA § 15-11-2 (8) (A), which defined a "deprived" child as one "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals").

[20] *In the Interest of A. B.*, 350 Ga. App. 575, 578 (2) (829 SE2d 842) (2019) (physical precedent only); *In the Interest of T. Y.*, 350 Ga. App. at 559; *In the Interest of H. B.*, 346 Ga. App. at 165 (1).

[21] *See In the Interest of A. J. H.*, 325 Ga. App. at 853 ("While we cannot say that the facts in this case would never merit a finding of deprivation, under these circumstances, where the Petitioners have failed to demonstrate harm to the child, clear and convincing evidence of deprivation has not been established." (punctuation omitted)). *Cf. In the Interest of A. B.*, 350 Ga. App. at 578-79 (2) (physical precedent only) ("[E]vidence before the juvenile court showed that the mother was mentally and economically unstable, lacked stable housing, abused illegal drugs, and actually

16

court's order finding the children were dependent as to Keller as of April 28, 2019, nunc pro tunc to March 29, 2019.

*Judgment reversed. Gobeil and Hodges, JJ., concur*.

---

abandoned her child. This record was sufficient to support the court's determination that *at the time of the hearing*, and by clear and convincing evidence, the mother was unfit in that she committed intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child. This record was also sufficient to support the juvenile court's determination that *at the time of the hearing*, and by clear and convincing evidence, the child was dependent as a result of the mother's unfitness and abandonment." (citations and punctuation omitted) (emphasis supplied)).

Decided February 25, 2020.

Dependency. Hall Juvenile Court. Before Judge Diaz.

*Conowal Welch Womack & Rinderknecht, Thomas D. Womack*, for appellant.

*Christopher M. Carr, Attorney General, Annette M. Cowart, Deputy Attorney General, Shalen S. Nelson, Calandra A. Harps, Senior Assistant Attorneys General, F. Barton Patterson, Assistant Attorney General*, for appellee.